Moses *v.* Ocoee Bank.

Moses, Adm'r, *et als.* *v.* Ocoee Bank *et als.*

1. BANKS. *Charter.* *Capital Stock cannot be paid in notes of Stockholders.*
   A charter requiring the capital stock of a banking corporation to be paid in coin, or in notes or bills which the corporators or directors may deem equivalent to or better than specie, does not authorize payment of said stock in the notes of the stockholders or directors, mutually endorsed.

2. SAME. *Notes.* *Statute of Limitations.* Such notes will be held as valid obligations for the protection of the issues of the bank and its general creditors, will bear interest and be subject to the statute of limitations, and when paid or collected will be credited as payments *pro tanto* on the unsatisfied stock.

3. SAME. *Stock.* *Statute of limitations do not run until a call is made.*
   Until the stock subscribed has been actually paid up, it will be considered as a debt subsisting independently of the notes executed in payment thereof, as to which the statute of limitations begin to run from the time a call is made for the payment of the stock.

4. STOCK. *Purchaser of unpaid stock.* *Liability.* A party purchasing the unpaid stock of another in a banking corporation, stands in the shoes of the vendor, and as the owner thereof becomes entitled to its benefits and subject to its burthens.

5. BANK. *Assets.* *Liability of Stockholders* Certain persons purchased the charter of a banking corporation, paying part cash and executing their note for the balance. After reorganizing the bank, the vendor

of the charter agreed to accept stock for his debt, which was accordingly issued to him, and the note was transferred to the bank and cancelled without payment. The cash payment to him, as well as the note, was charged to the bank. *Held,* that the note so transferred was the property of the bank, was not subject to cancellation without payment, and was assets of the bank, liable to the claims of its creditors; and that the cash payment was improperly charged to the bank; and inasmuch as the stock issued to the vendor was intended to go to him as paid up stock, the stockholders for whose benefit the charter was purchased are liable for its satisfaction in proportion to the amount of their respective subscriptions.

6. SAME. *Same. Same.* The note of a third party deposited by a stockholder of a bank in payment of his stock and subsequently collected by him, will be treated by a court of equity as the property of the bank, and such stockholder will be charged with the proceeds and interest from the time it was collected, and upon payment his stock will be credited according to the arrangement made at the time it was so deposited.

7. SAME. *Liabilities of Stockholders.* Where the minutes of the proceedings of a corporation show an order for the opening of books for subscription to stock therein, and the amount taken by each subscriber is there distinctly set forth, and where it appears that such subscribers had been directors of the corporation and had the right of access to the book containing said statement—*Held,* bound by the record to the amounts there shown, although no actual subscriptions to stock were produced.

8. SAME. *Stock will bear interest, when.* In adjusting the liabilities of subscribers to stock in a banking corporation, actual payments on stock will bear interest from the date at which they were made.

9. SAME. *Officers. Purchase of property.* An officer of a bank buying in property at execution sale for the bank debt for which it was sold, will not be permitted to claim the benefit of the purchase for himself where he used the debt for a time to pay his bid, and then without any corporate action to ratify the transactions, settled the debt with the bank. Property so purchased, is assets for the benefit of the creditors of the bank, and may be so applied, allowing the bank officer the proper credit for the amount actually paid by him in his settlement with the bank.

10. SAME. *Stockholders.* In adjusting the equities between the stockholders of a bank, those who paid their stock in notes of the bank, will be allowed only what they paid for the notes.

11. NOTES. *Endorsers. Statute of limitations.* A court of equity will not allow the statute of limitations to operate as a protection to endorsers

from liability on their endorsements, where it appears that their names were actively concealed by them from creditors actively seeking their remedy.

12. BANK CHARTER. *Reducing or increasing capital stock.* In the absence of a clause in a bank charter authorizing a reduction of the capital stock to which it has been raised under a discretionary power to increase it, the question, as to whether any such power would exist could not be raised, unless it clearly appears that the corporation ordered the reduction to be made. Neither equivocal acts, nor in-inferences, nor unauthorized acts of a president or directors, will have the effect.

13. BANK. *Unpaid Stock.* Where an amount of stock in a banking corporation exists subscribed and unpaid, and books are opened for the subscription of other stock for which a stock note is executed, the court cannot by construction declare the stock purporting to be subscribed a mere call on the old unpaid stock.

14. SAME. *Same.* Where, therefore, the stockholders of such a corporation ordered the books to be opened to increase the capital stock of the corporation a fixed amount, and authorized one of their uumber to give his and their note for the amount so increased in payment of the same, which he did, and subsequently, the stockholder so executing the note, instructed the cashier to reduce the stock by the amount thus subscribed, alleging the circulation issued upon it had been redeemed—*Held:* that the stock could not be so reduced, and that the creditors of the bank were entitled to have the amount so subscribed paid up by the stockholders, the proceeds arising therefrom to be applied to the satisfaction of their claims.

15. SAME. *Directors individually liable, when. Trustees.* Directors of a banking corporation accepting securities in payment of its stock not authorized by its charter, are personally liable for the whole amount so accepted in breach of their trust. While those suffering such securities, however, inferior to those required by the charter, to be lost by the statute of limitations would, *a fortiori*, be subject to the same liability. Trustees, to whom the management of the bank had been confided, would be similarly liable for losses arising through their laches, especially in a case where the assets had been in their possession for years, and where they had been admonished to diligence and good faith by suits of creditors, to whom they had refused information as to the affairs of the bank.

16. TRUSTEES. *Entitled to no compensation, when.* Where trustees, to whom have been assigned the assets and property of a banking corporation for the benefit of its creditors, etc., have been guilty of gross miscon-

Moses *v.* Ocoee Bank.

conduct toward such creditors, refusing inspection of their books, taking no steps to collect or distribute the assets, neglecting for years to sue upon the stock notes, loaning the only funds actually collected to themselves and the stockholders, etc., such trustees are entitled to no compensation as against the noteholders and creditors of the bank.

17. SAME. *Same. Public policy.* As between the trustees and stockholders, the former having carried out the settled policy and wishes of the latter with reference to the management of the trust property, and having consulted their interests to the exclusion of the interest of creditors, a different rule might apply, entitling them to compensation. did not a rule of public policy intervene, by which to prevent a collusion between corporations and their trustees detrimental to the ends of justice and good faith, trustees should be denied all compensation from any source, where, by misconduct and *mala fides* towards the public they have forfeited their claim to such compensation.

18. TRUSTEES. *Their duties.* The duty of a trustee of a banking corporation forbids the concealment of any fact from the noteholders and creditors which affects the value of their notes or debts. and requires them to disclose every fact that the creditor is concerned to know. It requires prompt distribution of cash assets, prompt notice to creditors to file claims, and a full recognition of the fact that they are equally the agents of the creditors to protect and to assist them, and of the corporation to husband and economically administer its resources.

19. BANKS. *Note-holders entitled to priority.* In the distribution of the assets of a bank, under the laws of this State, the holders of the circulating notes are entitled to priority of payment, then the creditors.

20. ATTORNEY. *Fees.* For the prosecution of the bill and amended bill filed to wind up the affairs of a banking corporation, and for valuable services rendered in the general litigation, counsel should be paid out of the aggregate recovery—all petitioning creditors who have come in to claim the benefit of the suit to contribute *pro rata;* while counsel who represent or perform services only for petitioning creditors, must be paid by their own clients out of the funds recovered for them.

---

FROM KNOX.

---

Appeal from the Chancery Court at Knoxville, W. F. COOPER, Ch.

HENDERSON, BROWN, LOGAN & LUCKEY for complainant.

CALDWELL, BAXTER, WEBB, PROSSER and REEVE for defendants.

Hon. J. B. HEISKELL, Sp. J., delivered the opinion of the. court.

On the 5th day of April, 1854, the Ocoee Bank was organized in the town of Cleveland, under a charter requiring stock to be paid in gold or silver, or in notes or bills which the corporators or directors may deem equivalent to or better than specie. The original stockholders, on the 22d of October, 1859, severally transferred their stock to the amount of $110,000 to the Branner Brothers and B. F. McFarland, and the existing organization having successively resigned their offices, the new stockholders were elected in their stead, G. M. Branner becoming president and the others directors. This transaction is shown to have been in consideration of thirty thousand dollars of a bonus, paid by the new corporators to the old, of which $5,000 was cash, and $25,000 in a note of G. M. Branner and his associates. It is not asserted that this was in consideration of any assets or effects of the existing corporation, the assets and liabilities of which are in no manner embraced in this record, but it seems from the admissions of the answers, to have been merely for the purchase of the charter. Nor does it appear in the record whether any stock had actually been paid in or called in the original corporation, though from

the reports of the bank appearing on the books, it would seem that payments must have been made.

The new company, however, seem not to have taken the stock as paid up, but regarding it as if newly subscribed, they sought to avail themselves of the privileges for which they had paid so handsome a bonus, by treating their own notes, endorsed by each other, as equivalent to or better than specie. Under this view they deposited their own notes, dated December 28th, 1859, to the amount of fifty thousand dollars, as a payment of stock, and deposited as further payment $40,000 in notes of the East Tennessee & Virginia Railroad Company, $8,800 in a draft on the Dandridge bank, and $1,200 in coin, and upon these as paid up stock, to the amount of $100,000, they proceeded to conduct a large banking operation, including a liberal issue of notes. This $100,000 was treated as one-half of the whole stock, which was to be $200,000, distributed in the manner shown in the minutes of the board. The minutes nowhere show any formal call of stock upon which a defaulting subscriber could have been sued by the bank on his stock. This mode of transacting banking business can have no countenance or recognition of courts. Such notes as were accepted in payment of the stock were not such as were authorized by a fair construction of the charter, and they cannot be regarded as payments. They will be held to be valid obligations for the protection of the noteholders and creditors, and enforced by decree in this case upon the suit of the complainants, upon payment of which, stock will be credited *pro tanto.* At the

same time the stock will be regarded as unsatisfied, and subsisting independently and uncalled, until actual payment of or decree for the notes. Upon these notes the ordinary incidents belonging to notes in this form must attach, and they will bear interest and be subject to the statute of limitations, to run from the time they fell due according to their terms.

These notes having been sufficiently described in the amended bill and relief prayed upon them, as against the makers, and that bill having been filed in time to save the bar of the statute of six years, relief will be granted upon the notes against the makers, except Wm. A. Branner. As to the endorsers, the only suit being that of the trustees, in whose cross-bill they are first named, and that being filed after the expiration of six years allowed by the statute, they cannot be held upon their endorsement.

As to the stock of Wm. A. Branner, he having died and the bar having run in favor of his personal representative on his note, complainants will be allowed to resort to his original liability for the equivalent in stock, which not being satisfied by the note, but remaining unpaid, and not called and so not due, will not bear interest or be barred by the statute of limitations. As to the amount of the payment to which Wm. A. Branner will be liable on his stock, we are of opinion that he must pay equally with those who have executed notes.

If interest-bearing stock notes are paid by one set of stockholders with interest, they may call upon other stockholders who had paid nothing, and have not given

notes, for a payment equal in amount to theirs, aggregating the principal and interest. For instance, if A, B, C and D are corporators, and A and B give interest-bearing notes for $50 per share on $100 shares of uncalled stock, while C and D give none and their stock bears no interest, if, at the end of five years, A and B pay on their notes $65 each of the capital stock on each share, it is manifest that the proper call to make on C and D would be each $65, and not $50, and probably this would pay sixty-five per cent of the stock of each. As the stock, however, is not likely to be exhausted, we leave this last point undecided, with leave to each stockholder to contest further payments when the principal of the stock is exhausted —counting interest only from calls or decrees, or perhaps from the filing of the bill.

. The names of the endorsers on these notes having been actively concealed from the note-holders, who were actively seeking their remedy in a court of equity, the statute would not be allowed to defeat their remedy, if by proper amendments they had sought relief on that ground.

Nor do we see any difficulty in the way of holding the directors of a bank, who conduct business on the basis of notes not authorized by their charter, personally liable to the note-holders and creditors, for the whole amount of so-called paid up capital. The director accepting such securities instead of coin, would each be liable for the whole amount so accepted in breach of his faith to the public. Others coming in after them would be liable on the same ground, while those

that suffered the securities thus existing, (however inferior to that of coin, to which the creditors were entitled for their security), to be lost by statute of limitations, would, for a stronger reason, be subject to the same liability.

Trustees would be subject to the same measure of liability for securities lost by their negligence, particularly if, as in this case, they had been in possession of such assets for years, and were admonished by suit of the creditors, to whom they had refused information, to diligence and good faith.

As, however, there seems to be ample assets in this case to satisfy the creditors without resorting to such liability, and the pleadings have not by amendment been adapted to this special relief, we prefer to put our decree upon other grounds.

The notes of the East Tennessee & Virginia Railroad Company, deposited in payment of the stock of John R. Branner and the other owners of the Dandridge bank, will be treated as the property of the bank, and John R. Branner's estate will be charged with the proceeds realized from them, with interest from the time they were collected by him. His estate will also be charged with the $8,800 check, with its interest up to the time it was collected by him, if the time appears on the record, otherwise with interest until it was appropriated by him, and then with interest until the final decree. Upon collection of these sums the stock of the parties putting in these effects will be credited according to the arrangement between the owners at the time they were put into the bank.

Actual payments upon stock will bear interest. All of the stockholders deny that they took stock beyond the amounts which they claim to have paid in, *in* notes or otherwise. No actual subscription of stock is produced, but the opening of books is ordered on the minutes of the proceedings of the corporation, and the amount taken by each is there distinctly set forth. As each of the stockholders had the right of access to this book, and as each of them was at some time a director, they must be held bound by the record to the amount of stock there shown.

Jos. A. Mabry, in his answer, claims to have paid the stock note of Wm. G. Swan and to have become entitled to his stock. In the argument he seeks to confine his purchase to the paid up stock. He evidently took the shoes of Swan and must be held to be the owner of his whole stock, entitled to its benefits and subject to its burthens.

Kyle & McFarland were charged by the Chancellor with the stock charged against them on the books, and have not appealed. There is no question before us, therefore, as to their liability.

After the reorganization, Waterhouse, to whom the note for bonus was made payable, agreed to take stock for his debt, and his note was transferred to the bank and new stock to the amount of $25,000 was issued to him. This note was afterwards charged to the bank and cancelled without being paid.

The $5,000 payment to him, increased by $500, probably incidental expenses, was also charged to the bank.

The note to Waterhouse having been transferred to the bank in payment of the stock, was the property of the bank, not subject to cancellation without payment, and is assets for the satisfaction of creditors.

The $5,500 bonus on charter was not a proper charge upon the bank, and the credit of that sum will not be allowed.

The stock issued to Waterhouse must have been intended to go to him as paid up stock. As it was for the purchase of the charter, in which the stockholders were interested *pro rata,* the liability for that stock will be distributed amongst them in proportion to their respective subscriptions.

Creditors may look either to the note or the stock liability. After the original $200,000 of stock purchased and subscribed and $25,000 to pay bonus, the stockholders, July the 1st, 1861, ordered that the books be opened to increase the capital stock $50,000, and "that John R. Branner give his note for himself and the other stockholders, for the above mentioned capital stock," which he did. Subsequently, John R. Branner instructed to cashier to reduce the stock by the amount thus subscribed, alleging that the circulation issued upon it had been redeemed. In the absence of a clause in a bank charter, authorizing a reduction of the capital stock to which it has been raised under a discretionary power to increase it, it would seem that no such power would exist. But to raise this question, it must clearly appear that the corporation did order the reduction to be made. Neither equivocal acts, nor inferences, nor unauthorized acts of a president or di-

rector, will have the effect. It is argued that this supposed increase of stock was really a call on the unpaid stock, or that it was an abandonment of the unpaid stock.

Where an amount of stock in a banking corporation exists subscribed and unpaid, and books are opened for the subscription of other stock, for which a stock note is executed, the court cannot by construction declare the stock purporting to be subscribed a mere call on the old unpaid stock. Parties who conduct such corporations must be supposed to know the meaning of ordinary steps in the management of such business, and of the ordinary language in which they are described.

The $50,000 of stock will be held to be additional to the $25,000 previously held by the stockholders, and will be charged to them in proportion to their previous subscription of stock.

It is insisted that no suit is brought on the $50,000 stock note. The amended bill charges that "the said note 495, made by the said John R. Branner, now dead, on the 28th of December, 1861, for $50,000, and given for capital stock, was on the 5th day of January, 1866, * * without any authority and without any part of the same having been paid, withdrawn from the capital stock and cancelled: said note amounting at the time to $62,600." The making of the note had been previously stated in the bill.

The bill then prays specifically that said stockholders and officers and trustees may be required by decree to pay their whole indebtedness to the bank, etc.

This is a sufficient statement of a cause of action and prayer for relief, and it is difficult to see in what sense the other claims are sued on, if this is not.

The trustees in this case refused inspection of the books upon demand of note-holders, took no active steps to collect and distribute the assets, have loaned the only funds actually collected to themselves and the stockholders, neglecting for years to sue upon the stock notes, and by concealing the names of endorsers on them have obstructed and embarrassed the remedies of creditors to that extent, and finally only brought suit after the time for suit against the endorsers had elapsed, though they were admonished by the original bill of the need of prompt action. They are, therefore, entitled to no compensation as against the note-holders and creditors, as to whom we have no hesitation in giving the effects to them, to the exclusion of the trustees.

A more difficult question arises between the stockholders and the trustees. The stockholders cannot deny that the trustees have faithfully carried out their wishes and executed the trust according to their settled policy and intent, and as between them the trustees ought to have compensation. A question of public policy intervenes at this point, however, and it is to be considered whether we shall best discountenance collusion between corporations and their trustees, by requiring the corporations to pay their compensation and so act in restraint of them, or by refusing compensation, and so act in restraint of those who are sought or employed as trustees.

Corporations usually being, when resort is had to assignments of their effects, embarrassed and often committed already to a previous course of illegal action, are likely to be restrained by a consideration of such an item of expense.

Reputable trustees are much more likely to be repelled from accepting trusts in which questionable delays are expected of them, if they know that they forfeit by misconduct all claim to compensation—and when they accept, they will be more readily accessible to the demands of the public or beneficiaries upon their courtesy and their good faith.

The duty of a trustee of a banking institution forbids the concealment of any fact from the body of the note-holders and creditors which affects the value of their notes or debts, and requires them to disclose every fact that the crditor is concerned to know. It requires prompt distribution of cash collected, prompt notice to creditors to file claims, and a full recognition of the fact that they are equally the agents of the creditor to protect and assist them, and of the corporation to husband and economically administer its resources.

We think we shall best admonish trustees of this duty and most effectually reach the ends of public policy, and best preserve the respect which the courts owe to themselves and the public they represent, by refusing to interpose, to make any order as between delinquent trustees and their assignors. Compensation to the trustees will, therefore, be refused. John R. Branner claimed to have bought at chancery sale a house

and lot in Jonesboro and a farm in Washington county, the property of W. G. Gammon, bidding for the house and lot $2,500 and for the farm $1,500. He afterwards sold the house and lot for $4,000, realizing a profit of $1,500. The bid was made by S. T. Logan, attorney and agent for the bank and in the name of the bank—the sale so returned and confirmed and title vested in the bank and the bank debt credited with the proceeds. Eleven months after the sale, J. R. Branner drew his check on the bank for the $4,000 and procured the court to declare him the purchaser and vest the title in him.

An officer of a bank buying in property at execution sale for the bank debt for which it was sold, and immediately paying the bank the amount of his bid, might perhaps claim the benefit of the purchase for himself. It would be otherwise where he used the debt for a time to pay his bid, and then without any corporate action to ratify the transaction, settled the debt with the bank.

In this case, as the purchase was with the means of the bank and in the name of the bank, and as J. R. Branner did not refund the money for eleven months, the bank is entitled to the profit of the transaction. Complainants may regard the farm in Washington county as assets and have a decree for the sale of the same—allowing J. R. Branner's estate credit for the amount bid for the same, if actually paid by him to the bank.

In the case of *Marr* v. *The Bank of West Tennessee,* at Jackson, 187–, this court held, that in the adjust-

ment of equities between the stockholders, those who had paid stock in notes of the bank should be allowed only what they paid for the notes.    To this opinion we adhere in this case.    Individually I am unable to answer the position of the Chancellor or to see any ground for holding that a stockholder or director is not, as between himself and the co-stockholders or directors, at liberty to buy up the notes with his own means and present them for payment at their face value.    If he is intrusted by the bank with means to buy them up, of course good faith to the corporation would preclude him from charging more than he paid.    If the question were between him and a note-holder from whom he bought notes at a discount, the rule of *uberrima fides* would apply.    But I do not see that directors are under any trust obligation to buy up notes of a bank of which they are directors, or to divide with others the profits of their purchases, if made.    It seems to me to be dealing outside of the mutual trust.    I yield, however, to the authority of the case cited.

In the distribution of the assets when realized, the note-holders are entitled to be first satisfied, then the creditors.

Creditors will be allowed to take decrees as ordered below, on all the stock notes, except as against sureties pleading the statute, and other choses in action, and be at liberty to take further decrees on the unpaid stock, to make up deficiencies or delay collections.    They will not be required to wait the collection of doubtful claims, or claims in litigation.

The stockholders must pay promptly and take upon themseves the onus of delay and risk as to all such claims.

The adjustment of equities between the stockholders is a matter in the main to follow after the payment of the creditors, and the court will not undertake to lay down any rules or give directions in advance as to the mode of doing this, further than is done incidentally in the opinion. We are reluctant to decide any question in this case which might affect this settlement. The pleadings have been framed almost exclusively in view of the questions between the complainants and the defendants, and the complainants are but slightly interested in many questions which may become important as affecting the respondents *inter sese.* These can hardly be fully aprehended by the respondents until the rights of the complainants are settled by decree, or even by actual collection of the sums decreed.

In the matter of counsel fees, complainants' fees are not a charge upon the bank or its funds, upon the principles which have been held to govern such matters in this State, though justice would seem to require the decree rendered by the Chancellor below.

For the prosecution of the bill and amended bills and for valuable services rendered in the general litigation, counsel should be paid for out of the aggregate recovery, all petitioning creditors contributing *pro rata,* they having come in to claim the benefit of the suit; while counsel who represent or perform services only for petitioning creditors, must be paid by their own clients out of the funds recovered for them.

There is no adjudication below as to the salary of G. M. Branner, and that matter is not properly before us.   It is claimed by G. M. Branner that there are two errors of $800 each in the computation of interest on notes of his.   If such is the fact, it ought to be corrected by counsel.   If it is matter of contest, it will be reopened upon counsel presenting briefs on the point.

Objection is urged in argument to references by the Chancellor for report on several exhibits to the cross-bill, on the ground that they are not proved in the record, or are disproved.   The decree is not final as to them, and the reference by the Chancellor seems to be fairly within the discretion of the court.   This court sometimes remands, in its discretion, a cause for further proof, and we can see no ground for objection to the action of the Chancellor if he has done the same thing in effect.

On the same grounds we see no objection to his action on the large claim filed by the East Tennessee and Virginia Railroad Company.   As this claim, with other claims of depositors, will be postponed to the claims of note-holders, the latter will not be delayed by any delays which may occur in this investigation.

The costs of this court will be paid out of the effects of the bank.   The costs below were properly adjudged there.

The decree below is affirmed, except so far as modified by this opinion.